125 N.J. Super. 162 (1973)
309 A.2d 619
THE STATE OF NEW JERSEY IN THE INTEREST OF A.B.M., JUVENILE-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 21, 1972.
Decided February 26, 1973.
*164 Before Judges LABRECQUE, KOLOVSKY and MATTHEWS.
Mrs. Rosemary K. Reavey, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Elson P. Kendall, Assistant Prosecutor, argued the cause for respondent (Mr. Karl Asch, Union County Prosecutor, attorney).
*165 PER CURIAM.
A.B.M., age 15 (hereafter the defendant), appeals from an order adjudging him a juvenile delinquent. He was charged with being a participant, with one A.W., in the murder of one Edwardo Perez, in violation of N.J.S.A. 2A:113-1, and with conduct endangering his health, morals and general welfare, in violation of N.J.S.A. 2A:4-14(1)m.
Perez, while taking an evening walk on April 18, 1971, was set upon, assaulted and robbed. When found he was in a dazed condition, bleeding from the head, and his wallet and identification were missing. There was a pool of blood on the sidewalk near where he was found, and a bloody stick, similar in shape to a broom handle, was found nearby (the blood was still wet). When taken to the hospital he was discovered to be suffering from multiple skull fractures and lacerations of the scalp. Later a craniectomy was performed in an effort to reduce the pressure from a subdural hematoma which developed. His condition was complicated by the presence of a "stress" ulcer with attendant gastrointestinal bleeding. He died on April 29, 1971. The primary cause of death was stated to be "subdural hemorrhage, fractured skull due to trauma." Secondary cause was "internal lesions and bleeding due to duodenal ulcer." It was said that the latter condition was "in all probability" secondary to his brain damage.
To the extent here pertinent the court found, in substance, that defendant had intentionally participated (with A.W.) in an atrocious assault and battery upon the victim in the course of a robbery, and that the victim had died as the result of the injuries sustained during the commission of the atrocious assault and battery. He was committed to an indeterminate term at the Training School for Boys at Jamesburg.
Defendant first contends that his oral confession was inadmissible because of its unreliability. He argues that his subnormal mentality precluded a knowing and intelligent waiver of his constitutional rights, his interrogation was conducted *166 in disregard of due process and fundamental fairness, and his confession was involuntary.
Prior to the introduction of testimony as to defendant's oral admission of guilt the trial judge conducted a voir dire hearing. At its conclusion he permitted evidence as to defendant's statements, holding that the State had established beyond a reasonable doubt that the Miranda warnings had been given and that there had been an intelligent and voluntary waiver of defendant's rights thereunder. We find that the proofs support this conclusion.
The State adduced testimony indicating that after the victim's death detectives, in the process of attempting to locate the suspect in another robbery, went to the house of A.W., also a juvenile. While they were there defendant came in. When during the questioning of A.W. the police made known their intention to take him to police headquarters, defendant elected to go along. On the way to police headquarters defendant was informed of his Miranda rights. At about 3 P.M., after the parties had arrived at police headquarters, O'Connell, another detective not connected with the investigation then under way, observed defendant and engaged in some small talk with him. In the process he asked defendant if he knew anything about the April 18 mugging of Perez  at the same time telling him that there was no need for him to say anything. Defendant's reply was that "the other fellow" knew about it. Upon hearing this O'Connell obtained defendant's home telephone number and attempted twice in defendant's presence to reach his mother. When he was unsuccessful in doing so defendant was again reminded that he did not have to answer questions. Thereafter, when asked what he knew about the Perez incident, A.B.M. stated that he and A.W. had mugged Perez. He related that he had been visiting A.W. in Elizabeth on April 18, and at 8 or 8:30 P.M. he and A.W. had gone for a walk. When they turned onto Marshall Street and spotted an old man walking towards them A.W. said, "Let's take him." Defendant was the first *167 to strike the victim, punching him in the face. Then A.W. struck him and he grabbed A.W. by his shirt. A.W. thereupon picked up a stick and hit the man on the head. A.W. then took his wallet and they ran back to A.W.'s house. The wallet was found to contain a $10 bill, which defendant changed at a bar across from A.W.'s house. They split the money between them and defendant took the bus to his home in Linden.
About an hour later O'Connell and another detective accompanied defendant as he retraced the route he asserted he and A.W. had taken during and after the mugging. After this defendant was brought back to headquarters and, the police still having been unable to locate his mother, detectives were sent to try to find her. It was not until about 6 P.M. that she was located and arrived at police headquarters. In the meantime defendant had been provided with food and cigarettes, and was detained in the office of the captain of detectives.
When defendant's mother arrived she was advised of her son's constitutional rights and also that the victim had passed away. After this defendant repeated in her presence that he and A.W. had assaulted and robbed Perez. She agreed to allow him to give a written confession, but later withdrew her permission. When she requested an attorney for her son the questioning ceased. This testimony in behalf of the State was contradicted in many respects by both defendant and his mother.
Two psychologists testified for the defendant that he had an I.Q. of 69 on one test and 66 on another, and was functioning on a mentally defective level. A psychiatrist called by the State testified that defendant could understand the Miranda warnings and was capable of giving a voluntary confession. The court found that it had been established beyond a reasonable doubt that the Miranda warnings had been given and that there had been an intelligent, voluntary waiver, that defendant had been treated with fundamental *168 fairness by the police during his questioning, that his mother had provided moral support, that his free will had not been overcome, and that his confession was sufficiently corroborated.
We hold that the admission into evidence of defendant's oral inculpatory statement was not error. State In Interest of R.W., 115 N.J. Super. 286, 295 (App. Div. 1971), aff'd o.b. 61 N.J. 118 (1972). In that case the oral confession of a 12-year-old boy with an I.Q. of 72 was held admissible even though his parents were not present, all required constitutional warnings were not given, and the interrogation took place in the early morning hours. In R.W., in response to the contentions that the juvenile's parents should have been present and that the juvenile's age and mentality prevented him from understanding the nature of the Miranda warnings, we held:
If the parents cannot or will not appear, the warnings should be given anyway, as a practical matter, against the possibility that the youth might understand and act upon them. But if the child is not old enough to understand and waive, and the parents cannot be found or cannot or will not attend, we hold that the questioning may go forward, even without the Miranda warnings, provided it is conducted with the utmost fairness, without force or other improper influence, mental or physical, and in accordance with the highest standdards of due process and fundamental fairness. (115 N.J. Super. at 296)
Here, as in R.W., the record reveals that there was a bona fide effort by the police to locate defendant's mother, that when she could not be reached the questioning continued with defendant's consent, and that it was conducted with the utmost fairness without force or other improper influence, mental or physical, in compliance with the highest standards of due process and fundamental fairness. State in Interest of Carlo, 48 N.J. 224 (1966), on which defendant principally relies, is factually distinguishable, as is also State in Interest of S.H., 61 N.J. 108 (1972).
*169 By his second point defendant urges that he should not have been adjudicated a delinquent based upon the charge of homicide because at the prior hearing of a similar charge against A.W. the latter had been found guilty of the atrocious assault and battery and the robbery, but not guilty of the homicide. He urges that he was charged, tried and adjudicated only as an aider and abettor and that since his principal was found not guilty of the murder he could not have aided and abetted in its commission. We find the point to be without merit. Its lack of merit stems from the fact that the complaint charged defendant as a principal with murder during the commission of a felony in violation of N.J.S.A. 2A:113-1. Under our law two persons who conspire to commit a crime and participate in some way in its commission are joint principals. State v. Cooper, 10 N.J. 532, 568 (1952). Here defendant's offense fitted that description. He and A.W. saw the victim, agreed to rob him, and did so, defendant striking the first blow. While defendant could have been punished as a principal even had he only aided and abetted A.W. in the perpetration of the assault and subsequent robbery, the trial judge based his finding of guilt upon defendant's "intentional participation" and specifically found that defendant "did commit an assault and battery on the victim" which was the proximate cause of the latter's death. The fact that another judge, before whom A.W. was tried, was not convinced beyond a reasonable doubt that the death of the victim proximately resulted from the atrocious assault and battery did not mandate a similar finding by the trial judge here. See State v. Mondrosch, 108 N.J. Super. 1 (App. Div. 1969), certif. den. 55 N.J. 600 (1970).
We find defendant's third point to be without merit. There was adequate compliance with the requirement of corroboration laid down in State v. Lucas, 30 N.J. 37, 56 (1959). Defendant's oral admissions contained details of the offense, many of which were verified through other testimony. The facts here are distinguishable from those set forth in *170 State In Interest of B.D., 110 N.J. Super. 585 (App. Div. 1969), aff'd o.b. 56 N.J. 325 (1970), in that here no details of the incident had been made known to defendant prior to his statement, and there was neither repetitious questioning, nor an inconsistent autopsy report, nor any serious doubts on its face as to the voluntariness or trustworthiness of defendant's oral statement. There was totally independent proof outside the statement, sufficient to sustain a finding that there had been an atrocious assault and battery upon the victim and that he had been robbed.
Defendant's final point, that the proofs did not establish that the death of the victim was the proximate result of the atrocious assault and battery, is without substance. The testimony of Dr. Ambrose, the attending physician, and Dr. Aronberg, the pathologist, which was undisputed, fully supports the finding that the victim did in fact die as a proximate result of his injuries. While he might have survived had his injuries not have had superimposed upon them the intestinal bleeding from the "stress" ulcer which manifested itself, there was medical proof adequate to support the conclusion beyond a reasonable doubt that this condition was proximately brought about by the victim's head injuries.
Affirmed.