# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0133-19

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MARC K. PANCHENKO,
a/k/a MARCUS PAN and
MARK PANCHENKO,

      Defendant-Appellant.

_____

> Argued March 30, 2022 – Decided August 26, 2022
>
> Before Judges Accurso and Enright.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 18-06-0375.
>
> Michele E. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michele E. Friedman, of counsel and on the briefs).
>
> Daniel Finkelstein, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Daniel Finkelstein, of counsel and on the brief).

PER CURIAM

Following the grant of the State's motion to admit defendant Marc K. Panchenko's statement to the police, he entered a conditional guilty plea pursuant to a negotiated agreement to third-degree endangering the welfare of a child by possession of child pornography, N.J.S.A. 2C:24-4(b)(5)(b).  He appeals pursuant to Rule 3:9-3(f), contending the court erred in granting the State's motion.  He raises one issue for our consideration.

> POINT I
>
> MR. PANCHENKO'S PRIVILEGE AGAINST SELF-INCRIMINATION AND RIGHT TO COUNSEL WERE NOT SCRUPULOUSLY HONORED WHEN, AFTER HE EXPRESSLY REFUSED TO WAIVE HIS MIRANDA RIGHTS, THUS INVOKING THOSE RIGHTS, THE OFFICER DID NOT END THE DISCUSSION AND INSTEAD, CONTINUED TO SEEK A WAIVER.  MOREOVER, THE STATE FAILED TO MEET ITS BURDEN OF PROVING THAT MR. PANCHENKO VOLUNTARILY WAIVED HIS MIRANDA RIGHTS, GIVEN THE OFFICER'S QUID PRO QUO INDUCEMENT AND MR. PANCHENKO'S TESTIMONY THAT HE FELT HE WOULD BE DRAGGED AWAY IN HANDCUFFS IF HE DID NOT WAIVE HIS MIRANDA RIGHTS.
>
> > A.  Mr. Panchenko's Express Statement that He Was Not Waiving His Rights Constituted an Invocation of His Miranda Rights, and the Officer Failed to Scrupulously Honor that Invocation.

2

> B. The State Failed to Meet Its Burden of Proving Beyond a Reasonable Doubt that Mr. Panchenko Voluntarily Waived His <u>Miranda</u> Rights.

We reject his argument and affirm, substantially for the reasons expressed by Judge Deitch in his December 10, 2018 opinion granting the State's motion.

Two witnesses testified at the hearing on the motion, Nora Berrio, the detective in the Union County Prosecutor's Office who led the team executing the search warrant at defendant's apartment, and defendant. Berrio testified defendant answered the door to her early morning knock, and she showed him the search warrant authorizing the removal of materials relating to child pornography. He admitted her and the seven other officers who conducted the search, seizing his computers and electronic devices. According to Berrio, defendant was very cooperative, but peppered her with questions about why they were there, where they were from, and generally what was going on.

Berrio claimed she had defendant sit on his couch and told him they would have the opportunity to talk later if he chose, but that her recording device was in the car so any further conversation would have to wait. About an hour later, officers set up the recorder in defendant's bedroom, brought him into the room and prepared to take his statement. Before providing him

<u>Miranda</u>[1] warnings, Berrio again explained they were there as part of a child pornography investigation involving defendant, and she referenced a "cybertip." When defendant asked what she meant by a cybertip, Berrio told him she would explain after she provided defendant his rights.

Berrio and another detective read defendant the <u>Miranda</u> warnings, pausing after each one to have him orally and in writing confirm his understanding and initialing its receipt. When Berrio got to the waiver, defendant acknowledged he'd read and understood his rights, but said, "I don't think I'm gonna sign that, cause it's a waiver of rights." That led to the following exchange:

> Berrio: Okay.
>
> Defendant: I'm not waiving my rights.
>
> Berrio: Okay so you don't wanna, you don't have a, wanna have a conversation with me today?
>
> Defendant: I want to know how this came about.
>
> Berrio: Okay so I as mentioned to you before, um, I can't, by law, I, you know, wish I could tell you. It's not me, it's just the law.
>
> Defendant: You can't tell me why I'm here unless I willingly say (inaudible.)

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-0133-19

Berrio: Well no, we're here for . . . as I explained to you . . . we're here for a search warrant. It's a child pornography investigation. And so we were authorized by a judge to remove any electronics from your home, um, anything you have in your possession. So that's why we're here, okay. But details, the specific details, if you want to know, I can't get into that until we have an actual conversation, an actual declaration, actual statement. Um, this piece of paper, it basically just says that you're willing to talk to me without an attorney present, or you're willing to talk to me at this time. That's your right. If you don't want to talk to me right now, you don't have to. But I can't give you any more details. You know this protects you and it protects me.

Defendant: Do I get a copy of that cybertip stuff and how this came about, when you leave?

Berrio: No, I can't. Um, unfortunately, let's say um, later on down the line um, that's something that if you want to you have to go through an attorney to possibly get, that's not something I can give to you now. It's not me; it's just part of the process. So you could, certainly, definitely, absolutely, but you will have to go through the proper protocol to obtain it, so I can't just hand it to you today. So it's totally up to you. Whatever you're comfortable with. I mean . . . .

Defendant: Well all I can receive today is a piece of paper that says you are coming to take out my property.

Berrio: That's correct.

Defendant: That's it.

Berrio: That's correct.

5

A-0133-19

Defendant: No reason why?

Berrio: Um, I explained it to you why. It's a child pornography investigation, that's why.

Defendant: No reason as to how I was attached to this investigation?

Berrio: Those details I can't tell you until um, we have a conversation, so no.

Defendant: Am I forced to answer questions during the course of this conversation?

Berrio: So, so at any time . . . .

Defendant: Cause I don't have much trust, I have to tell you.

Berrio: No, I understand that. Listen, I'm, I think you can, pretty, I've been pretty fair, pretty honest with you thus far, am I correct?

Defendant: I don't know.

Berrio: Well I, I am. So it's pretty, what you're comfortable with. We can have an honest conversation, we can talk about my, you can answer my questions, but at any point or given time after we start this interview and you say you know what, I don't want to talk to her no more, then that's the end, um, at any time. You don't have to talk to me at all, or you can start to talk to me and during the process you say you know what, I changed my mind.

Defendant: You, you will answer my questions as to how I got attached to this investigation?

A-0133-19

Berrio: Yes, if you answer mine. I mean it goes a two-way street. You, we have to have a conversation, a dialog, right, but I, I will tell you as much as I can, absolutely. But it's totally up to you.

Defendant: Okay:

Berrio: What would you like to do?

Defendant: I'll continue for now.

The detectives then had defendant read the waiver out loud, which defendant did, saying, "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions," adding "until I decide not to." While executing the waiver and acknowledging the detectives had made "[n]o promises or threats," and had not applied any "pressure or coercion of any kind," defendant stated, "I wanna know why I was attached, that's why I'm doing this."

Berrio testified defendant thereafter told her he worked as a systems analyst and identified his computers, including a Toshiba laptop to which only he had access. Explaining the cybertip, Berrio told defendant he was "connected" to "a very bad picture" in a chat room by his IP address. When she asked defendant if he'd ever downloaded any child pornography on his computer, defendant acknowledged he'd been "in trouble for it in the past," but claimed he had not done so recently. When Berrio advised defendant the

detectives were conducting "a preview" of his computer, defendant told her they would not find child pornography. Berrio then paused the interview to check in with the detectives. When she returned and advised defendant there were images of child pornography on his Toshiba laptop, defendant ended the interview.

Defendant's version of events largely echoed Berrio's. He testified the detectives arrived just as he was getting into the shower, and he answered the door dressed only in a pair of running shorts. After showing him the search warrant, defendant claimed the detectives "kind of cornered [him] off into [his] kitchen" and had him sit on "a little couch" while they fanned out throughout his apartment. Defendant couldn't recall whether one of the detectives led him into his bedroom to get some additional clothes or brought them to him, but he wasn't allowed to dress alone. Defendant also wasn't allowed a cigarette initially, and a detective accompanied him to the bathroom and would not allow him to shut the door.

On cross-examination, defendant admitted he had twice previously been arrested and convicted of offenses involving child pornography and had been provided Miranda warnings in connection with those arrests. He testified he had no substantive conversation with the detectives before the audio recording,

A-0133-19

which the judge listened to before the hearing. Defendant agreed with the prosecutor that he was "interested in understanding why the detectives were there," but claimed he told Berrio he "didn't want to revoke any of [his] rights, but she continued to speak." Although acknowledging he had asked Berrio to tell him how he'd become a part of her investigation, defendant testified she'd said they'd "have to talk together," which "came across like a quid pro quo."

The judge asked defendant about that last statement. Specifically, if he had correctly understood defendant's testimony to be that he'd been putting some general questions to Berrio and receiving general answers to the effect that detectives had a search warrant and were investigating child pornography, when Berrio essentially told him "look, if you want to find out some specifics, you're going to have to agree to waive your rights."

Defendant agreed, explaining he told Berrio he "didn't want . . . to revoke any of [his] rights" and she kept telling him she couldn't explain why she was there if he wouldn't talk to her. Defendant testified he "wanted to find out what caused this," and although he didn't "want to use the word 'badger,' because it puts them in a bad light, but that's the way [he] felt." In other words, "if you don't talk to me, we're not going to tell you anything, and we're just going to handcuff you and drag you away." While agreeing with the judge

that he'd been the subject of a search warrant before and thus knew if he was going to be arrested "this case was going to follow those same types of procedures — arrest, lawyer, discovery, that kind of thing," defendant claimed "[t]his was the first time [he] was given the — 'we're not going to tell you anything unless you talk with us' line."

Having heard the testimony, Judge Deitch rejected the State's argument that defendant was not in custody when he made his statement. The judge found there was no question based on the testimony of defendant and Berrio, both of whom he found credible witnesses, but that defendant was subjected to a custodial interrogation. He nevertheless granted the State's motion to admit defendant's statement, finding defendant voluntarily waived his right to remain silent and rejecting defendant's argument that his statement was coerced or improperly induced.

After canvassing the relevant cases, the judge considered the totality of the surrounding circumstances to test the State's claim that defendant had validly waived his right to remain silent. See State v. Warmbrun, 277 N.J. Super. 51, 62 (App. Div. 1994). The judge noted defendant was forty-two years old when he made his statement; college educated and working as a technical systems analyst. In addition to being familiar with computers,

10

defendant was also familiar with the criminal justice system, having previously been convicted in federal and state court of offenses involving child pornography. The interview, which took place in defendant's bedroom, lasted for approximately thirty minutes and was ended by defendant.

The judge found defendant "was aware of his rights, the use of a search warrant in a child-pornography case and the implications of the police searching his home." He also admitted he knew, based on his past experiences, "that he could remain silent, and he would be provided with an attorney and the State's discovery against him." The judge found defendant didn't "want to wait to have his questions answered and waived his rights to obtain the information he desired. When he became uncomfortable speaking further, he invoked his rights and the interview was terminated."

The judge concluded there was simply "no evidence" in the record "that defendant's statement was coerced or improperly induced." He noted that defendant, after he read aloud from the waiver form that "no promises or threats have been made to me and no pressure or coercion of any kind has been used against me" said "that is true," and he confirmed it again at the hearing. Viewing the totality of the circumstances surrounding defendant's statement,

11

A-0133-19

the judge concluded "[d]efendant's will was not overborne, his statement was given voluntarily, and it is admissible as evidence."

Defendant appeals, reprising the arguments he made to the trial court, and arguing the State failed to carry its burden of proving beyond a reasonable doubt his waiver "was knowing, intelligent, and voluntary in light of all the circumstances." State v. Tillery, 238 N.J. 293, 316 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)). As already noted, we cannot agree.

We begin by rejecting defendant's claim that "his right to cut off questioning" was not "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 104 (1975). Defendant had just acknowledged that he understood each of his Miranda rights and the waiver language on the rights form when he announced to the detectives that he didn't think he was "gonna sign that, cause it's a waiver of rights," and he was "not waiving [his] rights." There was thus nothing inappropriate about Berrio's question seeking to clarify that defendant did not "wanna have a conversation" with her. See State v. Harvey, 151 N.J. 117, 221 (1997) ("If police are unsure whether a defendant is asserting his right to silence, they must either stop the interrogation completely or 'ask only questions narrowly directed to determining whether defendant was willing to continue.'" (quoting State v. Johnson, 120 N.J. 263, 284 (1990))). "Such

questioning is not considered 'interrogation' under <u>Miranda</u>, because it is not intended to 'elicit an incriminating response from the suspect.'" <u>Johnson</u>, 120 N.J. at 283 (quoting <u>Christopher v. Florida</u>, 824 F.2d 836, 842 n.16 (11th Cir. 1987)).

And the clarifying question was apparently necessary, because instead of agreeing he did not want to have a conversation with the detectives, defendant made clear he did want to continue the conversation because he "want[ed] to know how this came about." Because we are satisfied the detectives scrupulously honored defendant's right to cut off questioning, we consider whether defendant's waiver of that right was knowing, intelligent, and voluntary in light of the circumstances. <u>See</u> <u>State v. Fuller</u>, 118 N.J. 75, 84 (1990) (explaining "the admissibility of statements made by an accused after invoking the right to silence depends on the resolution of two separate inquiries: first, was the right scrupulously honored; second, was the waiver knowing, intelligent, and voluntary").

As the Supreme Court explained in <u>Presha</u>, "the root of the inquiry is whether a suspect's will has been overborne by police conduct," 163 N.J. at 313, which "is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court,"

State v. A.M., 237 N.J. 384, 398 (2019).  Here, Judge Deitch applied the traditional totality of circumstances factors, considering defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] whether physical punishment or mental exhaustion was involved" and defendant's "previous encounters with the law," Presha, 163 N.J. at 313 (quoting State v. Miller, 76 N.J. 392, 402 (1978)), concluding none supported defendant's claim that his statement was wrested from him involuntarily.

As the judge found, there is no doubt defendant was both aware he was in custody, and that police wanted to talk with him about child pornography. He, in turn, was interested in learning exactly "how this came about" and how he "got attached to this investigation."  Although the detective refused to share that information with defendant before ensuring he was cognizant of and waived his rights, neither the Fifth Amendment nor our state-law privilege against self-incrimination compels police to share details of their investigation with a suspect, or the charges he might face, before questioning him.  See State v. Sims, 250 N.J. 189, 214-17 (2022).

As the Court explained in State v. Nyhammer, there is no requirement that "'the police supply a suspect with a flow of information to help him

14                                                                                    A-0133-19

calibrate his self-interest in deciding whether to speak or stand by his rights' because 'the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature.'" 197 N.J. 383, 407 (2009) (quoting Colorado v. Spring, 479 U.S. 564, 576-77 (1987)). Here, Judge Deitch found defendant "was well aware of his rights, the use of a search warrant in a child-pornography case and the implications of the police searching his home," and knew "he could remain silent" and would eventually be provided an attorney and "the State's discovery against him." The judge found defendant didn't "want to wait to have his questions answered" and was thus willing to waive his right to cut off questioning in order to obtain the information from the detective.

Those findings are entitled to our deference because they are amply supported in the record. State v. Locurto, 157 N.J. 463, 471 (1999). Defendant himself made clear he was waiving his Miranda rights and willing to answer questions because he wanted to "know why [he] was attached, that's why [he was] doing this." In short, we are satisfied the State proved beyond a reasonable doubt that defendant's waiver was knowing, intelligent, and voluntary in light of all the circumstances and thus affirm the admissibility of

15

his statement, substantially for the reasons expressed by Judge Deitch in his opinion of December 10, 2018.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0133-19